UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>PARIS HARRIS,<br><br>    Defendant. | No. 09 CR 0028-2<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

**I. Factual Background**

In June 2008, the Federal Bureau of Investigation, working with a cooperating source ("CS"), conducted a controlled drug buy in connection with the ongoing investigation of Ernest Jones, a high-ranking officer in the Black P Stone Nation ("BPSN") street gang. On June 12, 2008, the FBI and its CS placed controlled telephone calls for the purpose of purchasing approximately four and one-half ounces of crack cocaine. The FBI recorded numerous telephone calls between the CS and Jones. These calls were for the purpose of coordinating a drug purchase.

At around 11:00 AM on June 12, 2008, FBI agents equipped the CS with an audio/video recording device to capture images and sounds of the drug purchase. FBI agents drove the CS to the intersection of North Hamlin Avenue and West Lake Street, in Chicago, Illinois, the area where Jones wanted to meet to conduct the transaction. Jones told the CS he would be in a white Chevy Corsica. Upon arriving at Hamlin and Lake, the CS exited the car, walked to Garfield Park, and entered the front passenger seat of the white Chevy Corsica. In addition to the

concealed recording device on the CS, FBI agents were located strategically throughout the park for the purpose of surveilling the drug transaction.

Upon entering the front passenger seat of the Corsica, Jones asked the CS if he/she had the money. The CS handed Jones $3,400 which had been provided to him by agents. Jones advised the CS that they had to wait for the crack cocaine to be delivered. Specifically, Jones said that he was "waiting on them to come bring it to me." The CS informed Jones that he had to use the restroom and walked away from the car for a few minutes. When the CS returned to Jones' location, he/she sat down on the grass facing Jones in the car. Jones then exited the driver's seat and walked around to sit in the front passenger seat of the Corsica. While waiting on the delivery, the CS and Jones engaged in casual conversation about mutual acquaintances.

After a few minutes, a dark colored minivan, driven by a man later identified as Defendant Paris Harris, arrived and pulled up directly behind the Corsica. Jones got out of the Corsica and walked with the CS back to the van. The CS walked to the front passenger door of the van, where he/she observed two black males whom he/she recognized as members of the BPSN street gang, but did not know their names. The male in the passenger seat exited the van and the CS entered, at which time the CS was handed a plastic bag by the driver, Defendant Harris, that appeared to contain 4.5 ounces of crack cocaine. The CS placed the plastic bag in his/her pocket, exited the van, and walked back toward the intersection of Hamlin and Lake where he/she was picked up by the FBI agents.

The foregoing information was included in a complaint and supporting affidavit signed by FBI Special Agent William Noser ("Noser Affidavit"). The Noser Affidavit was based upon information provided by the CS, as well as by corroborating physical surveillance, the

audio/video recording of the transaction, and the consensually recorded phone calls. On the basis of the Noser Affidavit, United States Magistrate Judge Ashman issued an arrest warrant for Defendant Harris on January 13, 2009.

On January 14, 2009, law enforcement agents executed the arrest warrant on Defendant at the home of his girlfriend, Kimiki Truss. The facts regarding the recovery of a handgun at the Truss residence are contested. The government's version is that during the course of a protective sweep, law enforcement agents observed a gun case on a table next to the bed containing what appeared to be pressed cocaine and a handgun under the mattress in the bedroom, where Defendant and Truss had been prior to the arrest. Subsequently, Truss consented to a search of the residence. During the course of the search, agents recovered the handgun from under the mattress in the bedroom. Defendant's version is that law enforcement agents seized the gun before obtaining consent to search. Both parties agree that later that morning agents brought Defendant to FBI headquarters, where Defendant was processed, Mirandized, interviewed, and where Defendant gave a post-arrest statement.

Defendant Harris now moves to suppress any evidence, including the gun, recovered during the search of the home where he was arrested, as well as any statements he made incident to his arrest and search of the home. Defendant makes three arguments in support of his motion: (1) the arrest warrant issued was not supported by probable cause; (2) Truss' consent to search was coerced because law enforcement had already recovered the gun and showed it to Truss before she consented; and (3) in light of his first two arguments, Defendant's statement should be suppressed both because his arrest was unlawful and because agents allegedly coerced Defendant by mentioning the allegedly unlawfully obtained gun.

3

## II. Discussion

### A. Probable Cause Supported Defendant's Arrest

Defendant argues that the magistrate judge did not have probable cause to issue an arrest warrant. Law enforcement has probable cause to arrest an individual where the facts and circumstances within their knowledge and about which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense. *United States v. Towns*, 913 F.2d 434, 439 (7th Cir. 1990) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. de Soto*, 885 F.2d 354, 367 (7th Cir. 1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). The weight of evidence required to support a finding of probable cause is less than a preponderance. *United States v. Limares*, 269 F.3d 794, 798 (7th Cir. 2001) (citing *Gates*, 462 U.S. at 235-36). And when, as here, the affidavit is the only evidence presented to the warrant-issuing magistrate, "the warrant must stand or fall solely on the contents of the affidavit." *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002) (quoting *United States v. Roth*, 391 F.2d 507, 509 (7th Cir. 1967)).

Here, the information in the Noser Affidavit presented to the magistrate court was more than sufficient to show that there was "a probability or substantial chance" that Defendant was involved in criminal activity. The CS was searched before the meeting and provided with $3,400 by the agents. The CS met with Jones in Garfield Park, pursuant to directions given by Jones to the CS over the phone. After entering Jones' vehicle, the CS asked "are you ready?" to which Jones replied "I'm waiting on them to come bring it to me." The CS gave Jones the $3,400. The

CS and Jones waited together until Defendant drove up in a dark van. Defendant's passenger got out of the van, and the CS got into the van and spoke to Defendant. The CS exited the van, left the park, and returned to the agents with 4.5 ounces of crack cocaine. The CS was under surveillance from the time he was dropped off by law enforcement near the park until the time he returned.

The CS clearly obtained the crack cocaine from one of the three individuals he met with in the park. It was not likely Jones, because Jones said that he was "waiting on them to come bring it to me" and proceeded to wait with the CS. It was not likely the passenger of the van, because the CS would have had little reason to get into the van with Defendant if that were the case. Therefore, there was a "probability or substantial chance" that Defendant gave the CS the drugs.

In addition, the information provided by the CS (that the CS gave Jones the $3,400 and that Defendant handed CS the drugs) is supported by other indicia of reliability. The CS not only observed the transaction first hand, but he was part of the transaction.

Defendant's argument that a "cohesive picture of [Defendant's] alleged activities" cannot be gleaned from the government's sources is without merit. To characterize the conversation between the CS and Defendant in the van as "innocuous" is to ignore the larger context that was recounted in the Noser Affidavit. In addition, the fact that the video recording device, which during the time the CS was in the van was facing the dashboard, did not capture the transfer of the plastic bag from Defendant to the CS does nothing to defeat probable cause. Absence of evidence of the transaction on the video is not evidence of the transaction's absence. The same is true of the surveillance report that details the CS's movements while in the park. That report,

Defense Exhibit B, states that, at 11:56 AM, "A dark colored van pulls up and parks behind the white Chevy Corsica. The [CS] and JONES approach the passenger side of the van. The van is occupied by two black male subjects." The next entry, recorded two minutes later, at 11:58 AM, states "[CS] walks away from the van." The fact that the agents did not see what happened during those two minutes does not mean that the surveillance report contradicts either the audio/video recorder or the information provided by the CS. Again, absence of evidence is not evidence of absence.

The Noser Affidavit and the sources on which it relied present a cohesive picture of Defendant's involvement in the crack cocaine sale. There was probable cause for the magistrate judge to issue the arrest warrant because there was more than a probability or substantial chance that Defendant was involved in criminal activity.

### B. Recovery of the handgun

#### 1. Search incident to Defendant's arrest

Defendant next argues that the agents coerced Truss to consent to a search of her home because the agents had already recovered the gun and showed it to Truss before ever asking for her consent to search anything. The government contests Defendant's version of the facts that law enforcement agents seized the gun before obtaining consent to search. However, regardless of when the agents recovered the gun, its recovery was justified as part of the search incident to Defendant's arrest.

Assuming the seizure of the gun occurred before law enforcement obtained Truss' consent to search, the gun was justifiably seized as incident to Defendant's lawful arrest because the gun was recovered from the bedroom after Defendant was arrested coming out of the

6

bedroom. *See United States v. Tejada*, 524 F.3d 809 (7th Cir. 2008) (law enforcement justified in searching the area that was in the immediate reach of the defendant at the time he was arrested, even though he was no longer there at the time of the search). In *Tejada*, the Seventh Circuit reasoned that "if the police could lawfully have searched the defendant's grabbing radius at the moment of arrest, he has no legitimate complaint if, the better to protect themselves from him, they first put him outside that radius." *Id.* at 812.

Here, it is uncontested that Defendant was in the bedroom at the time that agents entered the residence and that Defendant was apprehended by agents as he was coming out of the bedroom. The bedroom, and specifically the mattress, was within Defendant's grabbing radius at the time of his arrest. *See Tejada*, 524 F.3d at 811 (entertainment center that was within a few steps of the defendant at the time of his arrest was within defendant's grabbing distance). Thus, even though at the time of the search the Defendant was removed from the radius, under *Tejada*, the agents were justified in recovering the gun.

Defendant argues that *Arizona v. Gant* compels a different result. 129 S.Ct. 1710 (2009). In *Gant*, the Supreme Court recently held that a warrantless search of vehicle incident to arrest is only authorized if the arrestee is within reaching distance at the time of the search or if it is reasonable to believe that the vehicle contains evidence of the offense of arrest. *Id.* at 1723. However, the holding in *Gant* was limited to searches of vehicles incident to the arrest of the vehicle's recent occupant. *Id*. at 1723-24. As such, *Gant* fails to abrogate *Tejada*, on which I rely.

2. <u>Inevitable discovery</u>

While I have declined Defendant's invitation to extend *Arizona v. Gant*, in light of its holding and in light of the facts and circumstances of this case, I will also address the Government's alternative theory of admissibility; that is, that the gun is admissible pursuant to the inevitable discovery exception to the exclusionary rule. The inevitable discovery exception to the exclusionary rule permits the introduction of evidence that eventually would have been located in the course of lawful police conduct had there been no error. *United States v. Jones*, 72 F.3d 1324, 1330 (7th Cir. 1995). When the government seeks to use the doctrine of inevitable discovery to excuse its failure to have obtained a search warrant, it must "prove that a warrant would certainly, and not merely probably, have been issued had it been applied for." *United States v. Marrocco*, No. 07-3101, 2009 WL 2581339, at *8 (7th Cir. Aug. 24, 2009) (quotation omitted).

In *United States v. Goins*, 437 F.3d 644 (7th Cir. 2006), the Court of Appeals upheld a ruling that a gun was admissible under the inevitable discovery doctrine where an officer discovered a closed gun case under a sofa, opened the case, and found a handgun inside. The officers in *Goins* had obtained consent to search the home, but they did not have consent to open the unopened gun case found under the sofa. One of the officers opened the case and found a handgun. In upholding the gun's admissibility, the Seventh Circuit concluded that probable cause to obtain a warrant to open the gun case existed and the police inevitably would have applied for a warrant. In reaching that conclusion, the Court reasoned that the police officers were legally inside the apartment, the officer who discovered the object knew that it was likely a

gun case based on his experience as a police officer, and the officer knew that the gun likely belonged to a convicted felon.

In this case, the agents were lawfully in the apartment to execute the arrest warrant for Defendant. Once inside the apartment, the agents arrested Defendant as he was coming out of the bedroom. In the bedroom, on the table next to the bed, agents observed a white substance wrapped in clear plastic, which agents believed had the appearance and shape consistent with pressed cocaine. As evidenced by the photo log created on the day of Defendant's arrest, the white substance was located inside an otherwise empty gun case. The question is whether, based on what the officers observed in the bedroom on the night stand, they could have certainly obtained a warrant to search for the gun - which was located by agents under the mattress where Defendant and Truss had been prior to the arrest. The handgun, a Smith and Wesson .357 Magnum revolver, was found in between the mattress and the box spring and inside a Crown Royal bag.

Defendant argues that the evidence, which was lawfully observed by federal agents while executing the arrest warrant, would not have certainly established probable cause to obtain a search warrant because (1) laboratory testing later revealed that the white substance inside the gun case was not cocaine but rather a bar of soap, and (2) the gun case was closed when the agents entered the bedroom.

First, it matters not that subsequent laboratory testing revealed that the white substance in the plastic bag, in the bedroom, in the gun case, was a bar of soap. The agents were mistaken, but based on their training and experience, they believed that the substance resembled pressed

9

cocaine.  They would have been entitled to rely on that belief in applying for a warrant, and such belief would certainly have supported a finding a probable cause.

Now, assuming for a moment that the gun case was closed when agents observed it in the bedroom, our case closely resembles the situation in *Goins*.  The agents were legally inside the Truss residence and observed a gun case in plain view on the table next to the bed.  The record before me does not indicate that Defendant was a felon at the time of his January 14, 2008 arrest, but it does indicate that the arrest was executed in the City of Chicago, where the municipal code requires all handguns to be registered and essentially prohibits registration by anyone other than law enforcement personnel unless the gun was purchased before April 16, 1982.  *See* Municipal Code of Chicago §§ 8-20-040 & 8-20-050.  Defendant was born on July 29, 1980.  There is a small chance that the gun could have been registered by someone else prior to April 16, 1982 and "grandfathered in," but the unlikelihood of this possibility supports the certainty by which the agents could have obtained a warrant to open the gun case.

I am ordering a hearing to determine the precise location of the white substance in the plastic bag relative to the gun case on the bedside table and to determine what exactly the agents observed in plain view.  One report (Defendant's Exhibit G) only says that agents observed the white substance in plain view on the table next to the bed.  That report says nothing of a gun case.  However, the photo log (Defendant's Exhibit I) shows the white substance located inside the gun case which is sitting on the table next to the bed.  The picture also shows a person holding open the case to reveal the white substance, so it isn't clear that the substance would be in plain view if the person's hand were removed.  If the agents observed in plain view the white substance in the otherwise empty gun case, then they could have certainly obtained a warrant to search the entire bedroom, if not the entire apartment, for the missing gun.  Not only does the

empty gun case strongly suggest a gun in close proximity, but the presence of what the agents believed was a controlled substance enhances that suggestion because firearms are commonly associated with illegal drug trafficking. The amount of the white substance, too, would have contributed to the finding of probable cause. The fist-sized white substance is obviously not an amount of a substance that one would possess for solely personal use.

    *C. Defendant's post-arrest statement is admissible*

Lastly, Defendant argues that his post-arrest statement to the FBI agents should be suppressed both because his arrest was unlawful and because agents coerced Defendant when they utilized the handgun as leverage to obtain Defendant's statement. I reserve judgment on this argument pending the findings of fact and conclusions of law that result from the hearing. As discussed above, Defendant's arrest was not unlawful. Assuming the handgun was legally obtained, then it was appropriate for the agents to question Defendant about the gun at any time during the interview.

**III. Conclusion**

Defendant's motion to suppress is entered and continued pending a hearing on the above-identified factual issues, which will take place on the date of the next status hearing in this case.

                            ENTER:

                            _____
                            James B. Zagel
                            United States District Judge

DATE: September 21, 2009